KARL SCHAFFER, petitioner,

*v.*

MAIKA (also known as Marie) KRESTOVNIKOW; otherwise Mary Schaffer.

[Submitted July 10th, 1917. Decided October 9th, 1917.]

1. Proof of ceremonial marriage and proof of matrimonial relations for fifteen years raises a presumption of the legality of the marriage which can only be overcome by clear and conclusive evidence of the validity of a prior marriage, and that it subsisted at the time of the entering into the marriage in question.

2. The burden is on the petitioner seeking annulment on the ground that his wife was not divorced from a living husband at the time of her marriage to him, to negative every reasonable possibility of the invalidity of his wife's prior marriage.

3. Marriages between people of the Greek Orthodox faith and non-Christians in Russia being illegal there, are so regarded elsewhere.

4. Because the former husband of the defendant selected a priest of the Russian Church to perform the marriage ceremony, and because he was an officer in the Russian army, it may be presumed that he was of the Greek Orthodox faith, and the burden is on the complainant to show that he was not.

5. *Held,* evidence does not sufficiently establish the prior marriage of the defendant.

6. General neighborhood reputation of death of defendant's prior husband *held* admissible.

7. If the first marriage was legal and existing when the second was contracted, under the belief by the parties that the first was of no effect, and that they lived together as husband and wife under this belief, the moment when the disability was removed they became husband and wife.

8. If the second marriage was meretricious if, after the death of defendant's husband, she and the petitioner contracted to live as husband and wife, it would be sufficient.

9. The doctrine of "unclean hands" would bar the petitioner from a decree of annulment.

On petition and counter-claim.

*Mr. Abe J. David,* for the petitioner.

*Mr. Benjamin M. Weinberg,* for the defendant.

BACKES, V. C.

This is a petition for an annulment of marriage and a counter-claim for support under the statute. The petitioner and defendant are of the Jewish faith and were married in Husatin, Russia, January 15th, 1902, by a rabbi. They immediately came to this country, settling in Elizabeth, where they cohabited until the latter part of September, 1916, when the petitioner abandoned the defendant on the pretence that he had then discovered that she was not divorced, as she represented, at the time he married her. The petitioner has attained some prominence in Elizabeth and, due to the joint efforts of himself and defendant, has acquired considerable property. No children have been born of the union, but early in their married life they lawfully adopted a son. Up until he abruptly and pitilessly cast her aside, their habit and repute were notoriously those of husband and wife. In justification of his course, and as a ground for relief, the petitioner sets up that the defendant was married to one Vasili Krestovnikow, in 1889, and that this marriage subsisted at the time the petitioner married her. The proofs tend to show that Vasili and the defendant were married by a priest of the Russian church, and that they lived together as husband and wife in Cherna-Ostrow, a small village in Russia, over twelve years. The petitioner, who was then an itinerant photographer, took his meals at their home, made love to the defendant, persuaded her to believe that her marriage to Vasili was unlawful because he was a Gentile and she a Jewess, and elope with her to America. I give no credence to the petitioner's version that within three months after he departed from Cherna-Ostrow, the defendant followed him to the nearby town where they were married and represented that she had obtained a divorce, nor do I believe his story that he separated from the defendant because he discovered this was not true. He claims that her perfidy was disclosed to him when he came across a military pass issued to the defendant, in which she was certified as the wife of Vasili,

but this is obviously false because the pass was issued in 1901 when, to the knowledge of the petitioner, the defendant was living with Vasili as his wife. Abused confidence certainly did not actuate the petitioner. It may have been the lure of another woman, as intimated, but I surmise that the defection and his efforts to be rid of the defendant is because the darling of his youth is *passé* and he is weary of her.

The proof of a ceremonial marriage, and the fact that the petitioner and defendant lived in apparent matrimonial relation for fifteen years, raises a strong presumption of the legality of their marriage, and this presumption can only be overcome by clear and conclusive evidence of the validity of the first marriage and that it subsisted at the time the second was entered into. The burden of showing this is on the petitioner and to the extent of negativing every reasonable possibility of its invalidity. *Sparks v. Ross, 72 N. J. Eq. 762; affirmed, 75 N. J. Eq. 550.*

Under the laws of Russia, marriages entered into between people of the Greek Orthodox faith and non-Christians are illegal and void. *10 Comp. Civ. Stat. Rus. book 1 ch. 1 § 4 subdiv. 1 ¶ 37.* Illegal and void there, they are so regarded elsewhere. *1 Bish. Mar., D. & S. 887; Canale v. People, 177 Ill. 219.* Vasili was a Christian; the defendant a Jewess. While it is not distinctly proved that Vasili was of the Greek Orthodox faith, it may be presumed from the fact that he selected a priest of the Russian church—Greek Orthodox—to perform the marriage ceremony; and the further fact that he was an officer in the Russian army—a bandmaster—leads to the belief that he was. However, the burden is upon the petitioner to prove that he was not, and this he has not done. That Vasili was a member of the Russian church was not questioned during the trial nor upon the argument; the contention being that the defendant had changed her faith to that of Vasili's religion, and that this should be presumed from the presumption that the officiating clergyman performed his duty and proceeded only when his authority was complete. The defendant positively denied the change, and militating very strongly against any such presumption is the fact that the petitioner married the defendant as a Jewess, which, according to his own argument, could not have been ac-

complished if she were a Christian, unless deception had been practiced upon the rabbi. This, of course, is not pretended.

The evidence fails to establish a prior marriage with that degree of particularity required to overcome the powerful presumption of the legality of the marriage here assailed, and a denial of relief may be safely rested on this ground.

There are other grounds upon which this union may be upheld. Vasili died in 1904–1905. A presumption of his death is established by general neighborhood reputation that he died in the service, testimony whereof was given by numerous and dependable witnesses. This testimony is admissible. *1 Whart. Ev.* § 223; *2 Wigm. Ev.* § 1605; *Ringhouse v. Keever, 49 Ill. 470; Scott's Lessee v. Ratliffe, 5 Pet. 81; Arents v. Long Island Railroad Co., 156 N. Y. 1.* The petitioner contends that the presumption is overcome by the testimony of his father, who says he saw Vasili four years ago in Russia. Schaffer, Sr.'s, testimony is unsatisfactory and unconvincing, and while it is harsh to believe that it was given with relaxed conscience under pressure of the sinister and contemptible purpose of the son, this, under the circumstances, is not at all improbable. Now, assuming that the first marriage was legal and existing, and entertaining the view, as I do, that the second was contracted by the petitioner and defendant in the belief that the first was of no effect under the law, because of the diversity of religions of the contracting parties, and that they entered upon it with matrimonial intention, and subsequently cohabited, both before and after the removal of the impediment, apparently matrimonially, they, in law, became husband and wife the moment the disability was removed. *Robinson v. Robinson, 83 N. J. Eq. 150; affirmed, 84 N. J. Eq. 201.*

But, even if we should regard the cohabitation under the second marriage as meretricious at the start, and so continued until the death of Vasili, there is ample proof in the case showing an abandonment of the illicit relation and an intention thereafter to live in a legally matrimonial state as husband and wife. After being informed of Vasili's death in 1904, the petitioner declared to the defendant that she was his wife and announced in substantially the same language her status to others upon different

occasions, and thereafter the two, by habit, conduct and declarations, held themselves out as husband and wife. No particular words are necessary to declare or express a change of intention. If, from what was said by them, it can be gathered that the parties have entered into a contract to live henceforth as husband and wife and to abandon the old relation and to substitute therefor a matrimonial status, it will be sufficient. *Mick* v. *Mart, 65 Atl. Rep. 851; Bey* v. *Bey, 83 N. J. Eq. 239.*

Then, too, so far as respects relief to the petitioner, the doctrine of "unclean hands" would bar him if we looked upon the cohabitation as continuously criminal. *Rooney* v. *Rooney, 54 N. J. Eq. 231; Kretz* v. *Kretz, 73 N. J. Eq. 246; Freda* v. *Bergman, 77 N. J. Eq. 46.*

The prayer of the petition will be denied and alimony will be allowed the wife on her counter-claim, the amount and that of counsel fee to be fixed on motion for final decree. The alimony will begin to run from the filing of the petition. *Swallow* v. *Swallow, 84 N. J. Eq. 411.* Costs to the defendant.